IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

LINDA S. O'BRYAN,

        Plaintiff,

v.                      CIVIL ACTION NO.   5:13-cv-25981

SYNTHES, INC.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant Synthes, Inc.'s Motion for Summary Judgment* (Document 97), the *Memorandum of Law in Support* (Document 98), the *Plaintiff's Response to Defendant Synthes, Inc.'s Motion for Summary Judgment* (Document 101), the Defendant's *Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment* (Document 106), as well as all exhibits attached in support of the parties' submissions.   After careful consideration of the parties' written submissions and the entire record, and for the reasons stated more fully herein, the Court finds that the Defendant's motion should be granted in part and denied in part.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

The Court's January 27, 2014 *Memorandum Opinion and Order* (Document 31) with regard to dismissal under Rule 12(b) sets forth the factual and procedural history in detail.   The Court provides the following details as context for the ruling herein.

This personal injury action resulted from complications surrounding the implantation of a 1-mm thick, one-third Synthes plate in the Plaintiff's fractured right fibula following a fall down a

flight of stairs.  (Document 1-2 at 6, Complaint at 6.)  The Plaintiff suffered the fall on April 28, 2011.  She initially attempted to let the fracture heal on its own after consulting with her doctor.  That doctor recommended that she wear an equalizer brace and told her to use a walker and to bear weight as tolerable.  (Document 101 at 4.)  She then participated in physical therapy for approximately three weeks, was released to go back to work, and ultimately was allowed to remove her boot brace.  (*Id.* at 5.)  "In total, she wore the boot for two to three months; but the fracture never healed."  (*Id.*)

After learning that her fracture had failed to heal,[1] she sought the opinion of Dr. Matthew Nelson, a surgeon practicing in the field of general orthopedics.  (*Id.*)  On October 11, 2011, Dr. Nelson performed surgery to implant the Synthes 1 mm thick, one-third plate.  (*Id.*)  The Synthes plate came with a package insert.  Under "Warnings," this package insert stated that "[m]etallic internal fixation devices cannot withstand activity levels and/or loads equal to those placed on normal healthy bone as these devices are not designed to withstand the unsupported stress of full weight-bearing or load-bearing."  (*See* Document 97-8 at 2, Exhibit F at 2) (emphasis in original.)  The "Warnings" section also specified:

> 2. These devices can break when subjected to the increased loading associated with delayed union or nonunion.  Internal fixation appliances are load-sharing devices which hold a fracture in alignment until hearing occurs. If healing is delayed, or does not occur, the implant could eventually break due to metal fatigue. Loads produced by weight-bearing and activity levels will dictate the longevity of the implant.  The patient should understand that stress on an implant involves more than weight-bearing.  In the absence of solid bony union, the weight of the limb alone, muscular forces associated with moving a limb, or repeated stresses of apparent relatively small magnitude, can result in failure of the implant.

---

1   The Court notes that there is a dispute whether the bone was nonunion or delayed union.  In any event, the record indicates that the fracture did not heal.

(*Id*) (emphasis in original.)  Additionally, under "Precautions," the insert tells the physician to "[a]dequately instruct the patient," including that

> [t]he patient must be made aware of the limitations of the implant and that physical activity and full weight bearing or load bearing have been implicated in premature loosening, bending or fracture of internal fixation devices. The patient should understand that a metallic implant is not as strong as a normal, healthy bone and will fracture under normal weight bearing or load-bearing in the absence of complete bone healing.

(*Id.* at 3) (emphasis in original.)

Following surgery, the Plaintiff alleges that Dr. Nelson told her she could "be weight-bearing as tolerated and to wear her boot during the day" but that she could take it off at night. (*Id.*) She did not work for a "couple weeks" during which she stayed around the house, and continued to wear the boot. (*Id.* at 5-6.)

She alleges that she felt a "pop" and experienced severe pain after trying to lift her leg out of bed "three to four days after her surgery." (*Id.* at 6.) She alleges that the pain eventually subsided back to "the same level of pain [she] had experienced since her surgery." (*Id.*) She had a follow-up consultation with Dr. Nelson on November 2, 2011, complaining of severe pain. (*Id.*) After performing x-rays, Dr. Nelson confirmed that the implanted plate had fractured and a revision surgery was needed. (*Id.*) On December 20, 2011, he removed the fractured plate and implanted a 3.5 mm thick, 8-hole Synthes plate.[2] (*Id.*) She was also given crutches to use for support following the surgery. (*Id.* at 7.)

---

2  In addition to the different Synthes plate, Dr. Nelson also placed allograft bone matrix, a substance with bone growth enhancement properties, during the second surgery. (Document 101 at 6, fn 9.)

3

On January 4, 2012, Dr. Nelson conducted a follow-up with the Plaintiff and told her that she was "not to bear any weight on her right leg,[3] to keep her splint on, and that she could return to work after her follow-up appointment 'penciled in' for December 28, 2011." (*Id.* at 7.) As of February 12, 2012, the fibula fracture had healed. (Document 105-5 at 25.)

The Plaintiff retained Dr. Ram Kossowsky, Ph.D., to determine why the 1 mm Synthes plate fractured. (Document 101 at 7.) He "formed his opinions after review of Ms. O'Bryan's medical records; the plate's patent, design documents, FDA materials, package insert, product travelers (manufacturing and quality control records); the Synthes trauma catalog, fatigue testing, and online information;" as well as "the Manual of Internal Fixation; medical references; metallurgical and materials science references; the depositions of Ms. O'Bryan, Dr. Nelson, and Synthes' Mark Siravo; and a visual exam and scanning electron microscopy on the plate…" (*Id.* at 9.) Ultimately, he opined that the plate fractured because of fatigue, "and identified a pre-existing crack in one of the threads on surface IA as the fatigue initiation site."[4] (*Id.* at 10.)

The Defendant retained Dr. Jeffrey N. Kann, M.D. Dr. Kann reviewed Ms. O'Bryan's medical records—including various x-rays, the Synthes package insert, depositions and photographs. (Document 97-9 at 2, 5; Exhibit G at 2, 5.) Dr. Kann opines that the Synthes 1 mm plate "did not fracture as a result of any design defect in the plate itself," but instead broke "[b]ecause Ms. O'Bryan's fracture was not healed and she walked on or otherwise used the leg, [and] the leg plate underwent micromotion (bending) at the open screw hold, leading to fatigue and

---

[3] Dr. Nelson states in his deposition that he specifically told her to not bear any weight after the December 20, 2011 surgery. His post-operative report reveals that "[w]e had a lengthy discussion about the need to remain non-weight bearing. At this time patient [cannot afford] to be nonweight-bearing as she has to work at her work which involves walking. She is at risk for failure of fixation. Patient understands this risk. She will remain in fracture boot." (See Document 101-5 at 13-15.)

[4] The Court notes that Dr. Kossowsky "labeled the halves of the fractured plate as A and B, and then identified the sides of each half as I and II, so that segments IA and IB, as well as segments IIA and IIB are respective mating surfaces." (Document 101 at 9.)

4

fracture of the plate." (*Id.* at 5.) He further stated that "[i]t is not at all unusual for the plate to fracture after three to four weeks in these circumstances." (*Id.*) Dr. Kann also provided a supplement to his report after he reviewed Ms. O'Bryan's deposition. (Document 97-10; Exhibit H.) His opinion that the plate "broke as a result of repetitive micromotion and fatigue" remained unchanged. (*Id.* at 3.)

On September 13, 2013, the Plaintiff filed a four-count complaint in the Circuit Court of Raleigh County, West Virginia, against Defendants' Synthes, Inc. (Synthes), and Johnson & Johnson (J&J). The Plaintiff alleged negligence in Count I, strict liability in Count II, breach of warranty in Count III, and seeks punitive damages in Count IV. (*Id*. at 7-11.) She seeks "compensatory damages, punitive damages, attorney's fees, costs and disbursements of this action, prejudgment and post-judgment interest, and for such other relief as the court may deem appropriate." (*Id*. at 13-14.)

On October 17, 2013, the Defendants filed a *Notice of Removal* (Document 1) pursuant to 28 U.S.C. §§ 1441(a), 1446(a), and 1332. A review of the docket indicates that the Plaintiff never filed a motion to remand or otherwise opposed removal. On November 11, 2013, Defendant Johnson & Johnson filed a *Motion to Dismiss* (Document 11) and *Memorandum of Law in Support* (Document 12). The Plaintiff filed her *Response* (Document 13) on December 6, 2013. On December 13, 2013, Defendant Johnson & Johnson filed a *Reply* (Document 14). On January 27, 2014, the Court entered its *Memorandum Opinion and Order* (Document 31) granting Johnson & Johnson's motion to dismiss.

The *Defendant Synthes, Inc.'s Motion for Summary Judgment* was filed on January 5, 2015. Plaintiff's *Response* was filed on January 22, 2015, and on February 2, 2015, the Defendant filed its *Reply*. The matter is ripe for ruling.

## II. STANDARD OF REVIEW

The well-established standard for consideration of a motion for summary judgment is that summary judgment should be granted if the record, including the pleadings and other filings, discovery material, depositions, and affidavits, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must satisfy its burden of showing a genuine factual dispute by offering more than "[m]ere speculation" or a "scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252;

6

*JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. On the other hand, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

### III.  DISCUSSION

The Defendant argues that the Plaintiff has failed to "adduce evidence that her claimed injuries were proximately caused by the alleged defect in Synthes' product" and "failed to establish that the product was defective and unreasonably dangerous." (Document 98 at 1.)[5] The Defendant provides the standards for various negligence and strict liability claims under West Virginia law, and argues that summary judgment is appropriate because the Plaintiff's expert has conceded that the plate was manufactured according to specifications and argues that the expert is not qualified to opine on how long the plate "should have" lasted. (*Id.* at 2, 7-8, 9-11.) The Defendant contends that the expert is not qualified to offer many of his opinions. (*Id.* at 12-17.) Finally, the Defendant argues that the Plaintiff's expert did not offer any "expert opinion or evidence that the Plate would not have failed, absent the pre-existing crack." (*Id.* at 18-19) (emphasis in original.)

---

5      The Court notes that the Defendant at first argues that "Ms. O'Bryan does not allege the Synthes product had any design defect or that there was a failure to warn by Synthes," but then states that "Ms. O'Bryan's complaint alleges . . . failure to warn." (Document 98 at 1, 7.)

7

The Plaintiff responds in opposition that her expert is qualified to opine under Rule 702 of the Federal Rules of Evidence. (Document 101 at 13-14.) She argues that her expert "offered extensive testimony about how a crack defect was created . . . as a result of the manufacturing process; how that crack created a point of excessive stress which initiated fatigue fracture; and how that crack (sic) lead to fracture of the plate . . .." (*Id.* at 15.) With respect to the failure to warn, the Plaintiff argues that it is a jury question, and her doctor did not provide her with the package insert, she did not "recall receiving any warnings about risks associated with the plate itself," and she testified that "had she received a warning that the plate could fracture in less than four weeks, she would not have had the October, 2011 surgery and would have looked for some other alternative." (*Id.* at 15-16.) She reincorporates the same argument to support her negligence claim, as well as her breach of warranty claim, and notes that her expert is not the only expert that provides the necessary causal link, citing testimony from the implanting orthopedic doctor, Dr. Nelson, and testimony from the Defendant's expert, Dr. Kann. (*Id.* at 16-19.)

The Defendant's reply focuses on the timeliness of the Plaintiff's expert's supplemental report, and argues that in any event, his testimony is not admissible under the *Daubert* analysis. (Document 106 at 1-7.) It continues to argue that Plaintiff expert's opinions are inadmissible because they are unreliable. (*Id.* at 7-15.) The Defendant maintains that the expert's opinions are irrelevant. (*Id.* at 15-16.) It contends that the Plaintiff has still failed to offer evidence proving causation, and maintains that "the bottom line is the failure of the Plate in this case was a foregone conclusion because Ms. O'Bryan was allowed to walk on her leg post-surgery." (*Id.* at 16.) The Defendant claims that the Plaintiff also has failed to present evidence that the plate was negligently manufactured because she has not presented evidence criticizing the materials "chosen

8

or used, the manufacturing process, or Synthes' quality control procedures." (*Id.* at 19.) It stresses that the Plaintiff has failed to offer evidence supporting a defect in the failure to warn, noting that the plate came with package inserts that provided adequate warning to her doctor, who was ultimately tasked with selecting and instructing the patient-Plaintiff on risks and proper use. (*Id.*)

As an initial matter, the Court notes that it previously found that the Plaintiff's expert is qualified to render his opinions in this case. In other words, having denied the Defendant's *Daubert* motion *in limine*¸ the Court finds that the Plaintiff's expert opinions are appropriate for consideration on the instant motion for summary judgment. The alleged shortcomings and deficiencies with the Plaintiff's expert are matters subject to cross-examination.

### *A. Manufacturing Defect*

The West Virginia Supreme Court has "recognize[d] that a defective product may fall into three broad, and not necessarily mutually exclusive, categories: [1] design defectiveness; [2] structural defectiveness; and [3] use defectiveness arising out of the lack of, or the inadequacy of, warnings, instructions, and labels." *Morningstar v. Black & Decker Mfg. Co.*, 253 S.E.2d 666, 682 (W. Va. 1979) (brackets added).

#### *1. Strict Liability*

In *Morningstar*, the West Virginia Supreme Court also declared

> the general test for establishing strict liability in torts is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.

9

*Id.* at Syl. pt. 4 (reaffirmed in *Estep v. Mike Ferrell Ford Lincoln-Mercury, Inc.*, 672 S.E.2d 345, 355 (W. Va. 2008)). A manufacturing defect can be proven "when a product comes off the assembly line in a substandard condition." *Morningstar*, 253 S.E.2d at 681.

The Court finds that the Defendant's motion for summary judgment must be denied. Here, the Plaintiff has offered expert testimony that the plate was distributed with a pre-existing crack due to improper milling, or the drilling of holes, during the manufacturing process. The Defendant claims that there was no crack or pre-existing deformity, and the plate instead broke because of the Plaintiff's improper activity following surgery. Thus, there is a genuine dispute over a material fact—whether the plate had a pre-existing crack or not—which goes to the heart of the Plaintiff's claims. This genuine dispute can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party.

Furthermore, the Defendant's claim that the Plaintiff has failed to present direct evidence of a manufacturing defect, even if accepted as true, does not entitle it to summary judgment. The West Virginia Supreme Court in *Anderson v. Chrysler Corp.* held that

> circumstantial evidence may be sufficient to make a prima facie case in a strict liability action, even though the precise nature of the defect cannot be identified, so long as the evidence shows that a malfunction in the product occurred that would not ordinarily happen in the absence of a defect. Moreover, the plaintiff must show there was neither abnormal use of the product nor a reasonable secondary cause for the malfunction.

403 S.E.2d 189, 194 (W. Va. 1991). In the instant case, there is a dispute as to the "precise nature of the defect." The Plaintiff and the Defendant dispute whether improper post-surgery load or weight-bearing was a reasonable secondary cause for the malfunction or if it was instead due to the

alleged pre-existing crack. Thus, summary judgment is inappropriate on the strict liability manufacturing defect claim.

> *2. Negligence*

"Negligence is the failure of a reasonably prudent person to exercise due care in his conduct toward others from which injury can occur." *Walker v. Robertson*, 91 S.E.2d 468, 473 (W. Va. 1956). To prove negligence, a plaintiff must establish by a preponderance of the evidence "(1) [a] duty which the defendant owes him; (2) [a] negligent breach of that duty; [and] (3) [i]njuries received thereby, resulting proximately from the breach of that duty." *Webb v. Brown & Williamson Tobacco Co.*, 2 S.E.2d 898, 899 (1939). Like strict liability above, the Court finds that there is a genuine dispute of material fact. While neither party disputes that Synthes owed a duty to the Plaintiff or that the Plaintiff suffered an injury when the plate fractured, there is a dispute as to breach and causation.

The Defendant argues causation is absent because the Plaintiff's injuries could have resulted from her alleged improper weight-bearing and load-bearing after surgery. On the other hand, the Plaintiff reasons that the pre-existing crack caused the premature failure of the plate, based on the physical evidence, and the short amount of time before its failure, coupled with her position that she abided by instructions to stay off her feet and wore the protective boot brace. Again, there are genuine disputes as to material fact which can be resolved only by a finder of fact.

> *B. Use Defect: Failure to Warn*

As *Ilosky v. Michelin Tire* makes clear, use defectiveness arises "<u>when a product may be safe as designed and manufactured</u>, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." 307 S.E.2d 603

11

syl. pt. 2 (W. Va. 1983) (emphasis added). The Court finds that the Defendant's motion with respect to Plaintiff's failure to warn claim should be granted inasmuch as there is no genuine dispute as to a material fact for the jury's consideration. Because Defendant Synthes is a "manufacturer of medical devices," the learned intermediary doctrine applies to the Plaintiff's failure to warn claims. *See Tyree v. Boston Scientific Corp.*, -- F.Supp.3d --, 2014 WL 5431993 *2, *6 (S.D.W. Va. October 23, 2014) (Goodwin, J.) (agreeing with the argument that the West Virginia Supreme Court of Appeals' case rejecting the learned intermediary doctrine—*State ex rel. Johnson & Johnson v. Karl*, 647 S.E.2d 899 (2007) — "narrowly applied to prescription drug manufacturers and manufacturers engaged in direct-to-consumer ("DTC") advertising.") This Court finds the analysis and reasoning in *Tyree* particularly persuasive in this case involving surgical implantation of a plate or medical device with no evidence of direct to consumer advertising. "[T]he learned intermediary doctrine . . . require[es] [Synthes] to warn only the plaintiff's treating physicians" about the Synthes plate. *Id.* at *2.

The Court has carefully considered *Ilosky*, the opinion upon which the Plaintiff relies to advance her failure to warn claim, and finds that it predates *Tyree* and does not take into consideration the learned intermediary doctrine. 307 S.E.2d 603 (W. Va. 1983). Moreover, it is distinguishable in that the marketing and warnings relative to the tire at issue in *Ilosky* were intended for the end consumer. In view of the applicability of the learned intermediary doctrine, the Court finds that Defendant's motion for summary judgment should be granted on Plaintiff's failure to warn claim under both theories of negligence and strict liability.

12

*C. Warranties*

"West Virginia law provides for two types of implied warranties: (1) the implied warranty of merchantability; and (2) the implied warranty of fitness for a particular purpose." *Tyree v. Boston Scientific Corp*, 2014 WL 5359008, * 6 (October 20, 2014, S.D.W. Va. 2014) (Goodwin, J.). West Virginia Code § 46-2-314 specifcs the implied warranty of merchantability, while § 46-2-315 deals with the implied warranty of fitness for a particular purpose.

*1. Implied Warranty of Merchantability*

Specifically, § 46-2-314 states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." W. Va. Code 46-2-314(1). W. Va. Code § 46-2-314 "also lists minimum requirements goods must conform to be considered merchantable, including:"

> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair and average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.

W. Va. Code § 46-2-314(2); see also *Tyree*, 2014 WL 5359008 at *6. The Plaintiff has clearly alleged and supported with expert testimony her opinion that the Synthes plate emerged from the

13

manufacturing process with a crack, and that this crack resulted in the plate not being of fair and average quality nor fit for its normal use—establishment (albeit briefly) in the body. The Defendant argues the Plaintiff's injuries were the result of her improper activities, and not the purported pre-existing crack. In other words, there is a general dispute of material fact. A jury finding that the plate arrived from the manufacturing process with a pre-existing crack may then find that the plate was not of fair or average quality nor fit for its ordinary purpose. Therefore, Defendant's motion for summary judgment should be denied as to the implied warranty of merchantability claim.

*2. Implied Warranty of Fitness for a Particular Purpose*

Section 46-2-315 declares that an implied warranty exists "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . fit for such purpose." W. Va. Code § 46-2-315. Importantly, comment 2 of § 46-2-315 states

> [a] particular purpose differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

"Therefore, it is essential that the plaintiff allege a particular purpose that is *different* from the ordinary purpose of the [Synthes plate]." *Tyree*, 2014 WL 5359008 at * 7 (emphasis in original) (brackets added). The Plaintiff chose to have the Synthes plate implanted in her lower body because a fracture in her leg was not healing. Neither party disputes that the Synthes plate was designed for this very purpose. The Court finds that the Plaintiff has offered no evidence supporting an additional or particular purpose that differs from the ordinary purpose of the Synthes

14

plate.[6]  Because of this shortcoming, the Defendant's motion for summary judgment on the Plaintiff's implied warranty of fitness for a particular purpose claim should be granted.

## CONCLUSION

Wherefore, after careful consideration and consistent with the findings herein, the Court **ORDERS** that the *Defendant Synthes, Inc.'s Motion for Summary Judgment* (Document 97) be **GRANTED in part** and **DENIED in part**.  Specifically, the Court **ORDERS** that the motion for summary judgment be **GRANTED** as it pertains to the **failure to warn aspect of the negligence and strict liability claims contained in Counts I and II** and the **breach of implied warranty of fitness for a particular purpose claim contained in Count III**.  The Court further **ORDERS** that the motion for summary judgment be **DENIED** as to all other claims contained in the Plaintiff's complaint.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:     March 17, 2015

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

---

6    The Court notes that the Plaintiff appears to concede as much—if she ever claimed it in the first place—as she did not reply to the Defendant's argument that there are no facts or evidence to support an implied warranty of fitness for a particular purpose claim.  (*See* Document 101 at 17.)

15